1

2

3

4

UNITED STATES DISTRICT COURT
5       EASTERN DISTRICT OF WISCONSIN

6

DONNA DAWLEY, individually and Personal
7    Representative of the ESTATE OF
CHRISTOPHER J. DAWLEY                          NO.

8                 Plaintiffs,                  COMPLAINT FOR WRONGFUL
9                                              DEATH AND SURVIVORSHIP

        v.                                     JURY DEMAND
10
META PLATFORMS, INC., formerly known
11   as FACEBOOK, INC.; SNAP, INC.

12                Defendants.

13

14

15     In these digital public spaces, which are privately owned and tend to be run for
       profit, there can be tension between what's best for the technology company and
16     what's best for the individual user or for society. Business models are often built
       around maximizing user engagement as opposed to safeguarding users' health and
       ensuring that users engage with one another in safe and healthy ways.  . . .
17     Technology companies must step up and take responsibility for creating a safe
       digital environment for children and youth. Today, most companies are not
18     transparent about the impact of their products, which prevents parents and young
       people from making informed decisions and researchers from identifying
19     problems and solutions.

20     United States Surgeon General's Advisory
       December 7, 2021
21

22

23

COMPLAINT FOR WRONGFUL DEATH AND            SOCIAL MEDIA VICTIMS
SURVIVORSHIP - 1                            LAW CENTER PLLC
                                            801 SECOND AVENUE
                                            SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 1 of 36   Document 1

Plaintiff DONNA DAWLEY, is the mother of Christopher J. Dawley who died of suicide on January 4, 2015, and brings this action for wrongful death and survivorship against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), doing business as Instagram ("Instagram") and Snap, Inc. doing business as Snap Chat and alleges as follows:

## I. INTRODUCTION

1.     This product liability action seeks to hold Defendants' products responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers in the United States by Defendants and, specifically, for the death by suicide of Christopher J. Dawley on January 4, 2015, caused by his addictive use of Defendants' unreasonably dangerous and defective social media products.

2.      On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages twelve to sixteen in the U.S. increased a staggering 146 percent!

3.     The most significant and far-reaching change to the lives of young people during this period was the widespread adoption of mobile social media platforms, prominently the Instagram, Snapchat and Facebook products designed and distributed by Defendants. By 2014, 80 percent of high-school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly." Many children and teenagers spend hours throughout the day and night using Defendants' products.

4.     Peer reviewed studies and the available medical science have identified a particular type of social media and electronic device use associated with major mental health

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 2

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 2 of 36   Document 1

injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression and sleep deprivation. Both large observational studies and experimental results point to the heavy use of Defendants' social media products as a cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls.

5.     Defendants' own research also points to the use of Defendants' social media products as a cause of increased depression, suicidal ideation, sleep deprivation, and other, serious harms. Meta researchers, for example, found that Instagram is "worse" than many competitor products and "is seen as having the highest impact [on negative body and appearance comparison], although TikTok and SnapChat aren't far behind."

6.     Moreover, Defendants have invested billions of dollars to intentionally design and develop their products to encourage, enable, and push content to teens and children that Defendants know to be problematic and highly detrimental to their minor users' mental health.

7.     Internal, non-public data collected by Instagram and Facebook reveal large numbers of its users are engaging in problematic use of its products. Indeed, the problematic use identified in the medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

8.     Likewise, each of Defendants' products contain unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users.

9.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 3

Social Media Victims
Law Center PLLC
801 Second Avenue
Seattle WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 3 of 36   Document 1

consumers in general and minor users in particular. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

10. Plaintiffs also bring claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of their social media products. The addictive quality of Defendants' products and their harmful algorithms are unknown to minor users and their parents.

11. Plaintiffs also bring claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew, or in the exercise or ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products.

12. Plaintiff also brings claims under Wis. Stat § 100.18 based on Defendants unfair and deceptive trade practices in the marketing addictive social media products to unsuspecting minors.

**II. PARTIES**

13. Plaintiff DONNA DAWLEY resides in Salem, Wisconsin, is the mother of Christopher J. Dawley and will soon be appointed Personal Representative of his Estate.

14. Plaintiff DONNA DAWLEY has not entered into a User Agreement or other contractual relationship with any of the Defendants herein. As such, in prosecuting this action

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 4

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 4 of 36   Document 1

1    Plaintiff is not bound by any arbitration, forum selection, choice of law or class action waiver set

2    forth in said User Agreements. Further, as Personal Representative of the Estate of CJ Dawley,

3    Plaintiff expressly disaffirms any User Agreements with Defendants which CJ Dawley may have

4    accepted, which would have been entered into prior to his reaching the age of majority.

5        15.    Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware

6    corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms

7    owns and operates the Facebook and Instagram social media platforms, that are widely available

8    to users throughout the United States.

9        16.    Defendant Snap, Inc. is a Delaware corporation with its principal place of

10   business in Venice Beach, CA. Defendant Snap Inc. owns and operates the Snapchat social

11   media platform, an application that is widely marketed by Snap Inc. and available to users

12   throughout the United States.

13   **III.  JURISDICTION AND VENUE**

14       17.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. §

15   1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are

16   residents of different states. Venue is proper in this District under 28 U.S.C. § 1391(b)(2)

17   because a substantial part of the events giving rise to the claim occurred in the Eastern District of

18   Wisconsin.

19       18.    This Court has specific personal jurisdiction over Defendants Meta and Snap

20   because these Defendants transact business in the State of Wisconsin and purposefully avail

21   themselves of the benefits of transacting business with Wisconsin residents; Plaintiff's claims set

22   forth herein arise out of and/or relate to Defendants' activities in the State of Wisconsin and

23

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 5

purposeful availament of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

19.     Defendants have contracts with a significant percentage of the population of the State of Wisconsin relating to use of the products at issue in this case, and interact extensively with, send messages, notifications, and communications to, and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Wisconsin.

20.     Defendants advertises extensively in Wisconsin, through contractual relationships with third party "partners" who advertise on their behalf via electronic platforms and devices. Defendants Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Wisconsin for whom those devices are intended.

21.     Defendants have earned millions of dollars in annual revenue from their Wisconsin-related activities over the last several years arising from their defective and inherently dangerous social mediaproducts by Wisconsin residents, including children like Christopher J. Dawley.

## IV. FACTUAL ALLEGATIONS

### A. Facebook and Instagram Background

22.     Facebook is an American online social network service that is part of the Defendant Meta Platforms. Facebook was founded in 2004 and became the largest social

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 6

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 6 of 36   Document 1

network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters are in Menlo Park, California.

23.     Instagram is a photo sharing social media application that originally enabled users to post and share photos that could be seen by other users who "follow" the user. A user's followers could "like" and post comments on the photos. Instagram was purchased by Facebook, Inc. for approximately $1B in 2012.

24.     Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

25.     A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram. Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement – which, in the case of certain groups of users, including teens, translates to Meta's deliberate and repeated promotion of harmful and unhealthy content, which Meta knows or has reason to know is causing harm to its young users.

26.     Instagram also features a "discover" feature where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Again, Meta has designed its product in a manner such that it promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 7

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE, WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 7 of 36   Document 1

available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue increase.

27.    Users' profiles on Instagram may be public or private. On public profiles, any user is able to view the photos, videos, and other content posted by the user. On private profiles, the users' content may only be viewed by the user's followers, which the user is able to approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow request to underage users, including Decedent CJ Dawley.

28.    Defaulting profiles to public served no critical purpose in terms of product functionality and/or a user's ability to access content. Instead, this product feature increased user engagement during onboarding (when a user first starts using Instagram) by increasing user connections. However, Meta also knew that harmful and/or undesirable, even dangerous, contacts could be made through this public setting feature, particularly for users under the age of 18, including CJ Dawley.

29.    During the last five years, Instagram has added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram "Stories."

30.    Based on individualized data collected from their users' social media habits, Instagram independently selects content for its users and notifies them of such content through text and email.  Instagram's notifications to individuals users are specifically designed to and do prompt them to open Instagram and view the content selected by Instagram which increases the users screen time and resulting profits to Instagram.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 8

Social Media Victims
Law Center PLLC
801 SECOND AVENUE
SEATTLE, WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 8 of 36   Document 1

31.    Over time, Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

**B. Snapchat Background**

32.    Snapchat is a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. The Snapchat product is well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients.

33.    Snapchat's self-destructing content design feature is specifically intended to appeal to minor users by evading parents' ability to monitor their children's social media activity in exercise of their parental responsibility.   Snapchat's self-destructing content design feature permits minor users to exchange illegal and sexually explicit images with adults and provides sexual predators with a safe and efficient vehicle to recruit victims.

34.    Snapchat also features a series of rewards including trophies, streaks, and other signals of social recognition similar to the "likes" metrics available across other platforms. These features are designed to encourage users to share their videos and posts with the public. Snapchat designed these features to be addictive, and they are. Users also have an "explore" feed that displays content created by other users around the world.  The trophies, streaks, and other signals of social recognition that users receive is content neutral; users receive the same amount of rewards regardless of the content of the posts and videos they exchange,

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 9

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS    Filed 04/11/22    Page 9 of 36    Document 1

35.     All of these product features are designed to grab and keep users' attention for as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive."

36.     Snapchat was founded in 2011 by current president and CEO Evan Spiegel and several other co-founders while they were attending Stanford University.

37.     In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. In 2014, Snapchat also released a feature called Snapcash that allowed users to send money to other users without regard to user age, identify verification, and/or parental consent.

38.     Snapchat also allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users followers (and the public for Snaps submitted by the users) to see the user's location on a map. This feature is available to all users, including minors.

39.     By 2015, Snapchat had over 75 million monthly active users and was considered to be the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform.

**C. Defendants' Applications Are Products**

40.     Instagram, Facebook and Snapchat are products that are designed and manufactured by Meta and Snap, respectively. These products are designed to be used by minors and are actively marketed to minors across the United States including the State of Wisconsin. Further, Defendants are aware that large numbers of children under the age of 13 use their products despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 10

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

41.     In fact, these products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market to minors through their own marketing efforts and design. But also, Defendants work with and actively encourage advertisers to create ads targeted at and appealing to teens, and even to children under the age of 13. Defendants spend millions researching, analyzing, and experimenting with young children to find ways to make their products more appealing and addictive to these age groups, as these age groups are seen as the key to Defendants' long-term profitability and market dominance.

42.     Defendants are aware that large numbers of children under the age of 18 use their products without parental consent. They design their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

43.     Defendants are likewise aware that large numbers of children under the age of 13 use their products despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older.  They have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

**D.  Defendants' Business Model is Based on Maximizing User Screen Time**

44.     Defendants advertise their products as "free," because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive money from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications including, and specifically, users in Wisconsin under the age of 18.

45.     Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 11

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 11 of 36   Document 1

46.     Snapchat uses unknown and changing rewards that are designed to prompt users who consume Snapchat in excessive and dangerous ways. Snap knows or should know that its design has created extreme and addictive behaviors by its largely teenage and young-adult users. Indeed, Snap knowingly or purposefully designed its products to encourage such behaviors

47.     All the achievements and trophies in Snapchat are unknown to users.  The Company has stated that "[y]ou don't even know about the achievement until you unlock it." This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

48.     This design is akin to a slot machine but marketed toward teenage users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snap. The system is designed to reward increasingly extreme behavior because users are not actually aware of what stunt will unlock the next award.

49.     Instagram and Facebook, like Snapchat, are designed around a series of design features that do not add to the communication and communication utility of the application, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage user's developing minds.

50.     According to industry insiders, Defendants' have employed thousands of engineers to help make their products maximally addicting.  For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 12

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 12 of 36   Document 1

51.     Defendant do not warn users of the addictive design of their product. On the contrary, Defendants actively try to conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

52.     For example, in or around July 2018, Meta told BBC news that "at no stage does wanting something to be addictive factor into" its product design process. Similarly, Meta told U.S. Senators in November of 2020 that "We certainly do not want our products to be addictive." Yet, Meta product managers and designers attend and event present at an annual conference held in Silicon Valley called the Habit Summit, the primary purpose of which is to learn how to make products more habit forming.

53.     Defendants engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

54.     Internal Meta documents identify the potential of reduction in usage by their minor users as an "existential threat" to their business and spend billions of dollars per year marketing their products to minors. Defendants have deliberately traded in user harm to protect the revenue stream their products generate.

**E.  Defendants Have Designed Complex Algorithms to Addict Teen Users.**

55.     Defendants have intentionally designed their products to maximize users 'screen time, using complex algorithms designed to exploit human psychology and driven by the most

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 13

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 13 of 36   Document 1

advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world.

56. Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

57. One of these features—present in both Snapchat and Instagram—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never ending "feed." Defendants are well-aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health – however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

58. Defendants have also designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Defendants know to be harmful to their users. This is content that users might otherwise never see but for Defendant's affirmative pushing of such content to their accounts.

59. The addictive nature of Defendants products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary users.

60. Defendants go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

61. Defendants also have developed unique product features designed to limit and have in other ways limited Parents' ability to monitor and prevent problematic use by their children.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 14

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS    Filed 04/11/22    Page 14 of 36    Document 1

62.     The algorithms that render Defendants social products addictive are designed to be content neutral.  They adapt to the social media activity of individual users to promote whatever content will trigger a particular user's interest and maximize their screen time. Defendants' algorithm designs do not distinguish, rank, discriminate or prioritize between particular types of content on their social media platforms.  If User One is triggered by elephants and User Two is triggered by moonbeams, Defendants' algorithm design will promote elephant content to User One and moonbeam content to User Two.   Defendants' above-described algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users.

**F. Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

63.     The human brain is still developing during adolescence in ways consistent with adolescents demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

64.     The frontal lobes - and in particular the prefrontal cortex - of the brain play an essential part in higher-order cognitive functions, impulse control and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward.  They are also essential to the ability to control emotions and inhibit impulses.   MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

65.     During childhood and adolescence, the brain is maturing in at least two major ways.  First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 15

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 15 of 36   Document 1

Second, during childhood and adolescence, the brain is undergoing "pruning" - the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and continues into young adulthood.

66. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

67. The algorithms in Defendants' social media products exploit minor users diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 16

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 16 of 36   Document 1

**G. Defendants Misrepresent the Addictive Design and Effects of their Social Media Products**

68.     During the relevant time period, Defendants stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

69.     Neither Meta or Snap warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users, like Decedent CJ Dawley. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

**H. Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties**

70.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, as well as Defendants' own statements and actions, not as the speaker or publisher of third-party content.

71.     Defendants also failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms.  These dangers which are unknown to ordinary consumers, do not arise from third-party content contained on Defendants' social media platform but rather from their algorithms designs that 1) addict minor users to Defendants' products; 2) affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity; and 3) put minor users in contact with dangerous adult predators.

72.     Defendants' products are addictive on a content neutral basis.  For example, Defendants design and operate their algorithms in a manner intended to and that does change

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 17

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

73. Defendants' product features are designed to be and are addictive and harmful in themselves, without regard to any content that may exist on Defendants' platform, for example, Meta's "like" feature and Snapchat's "Snapstreaks" are content neutral.

74. Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' products.

75. Defendants promote, encourage, and/or otherwise contribute to the development of harmful content. For example, during an October 2021 Senate Hearing, members of the U.S. Congress made statements based on tens of thousands of Meta documents provided to them by a whistleblower, among which were several statements that support Plaintiff's allegations that Defendants promote, encourage, and/or otherwise contribute to the development of harmful content,

  a. Defendants approve of ads that contain harmful content, for example, "designed to encourage and promote anorexia" and encouraging children to abuse prescription or illegal drugs, which ads Defendants then target specifically at children in exchange for payment.

  b. Defendants utilize private information of their minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Again, Defendants specifically select and push this harmful content, for which

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 18

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 18 of 36   Document 1

they are paid, to increase user engagement. "That's how [defendants] can push teens into darker and darker places." (Senator Blumenthal, October 5, 2022).

    c.   Defendants "know[] that [their] amplification algorithms, things like engagement based ranking … can lead children from very innocuous topics like healthy recipes … all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time." Defendants have knowledge that their products and the content they are encouraging and helping to create is harmful to young users and choose "profits over safety."

76.    Defendants have information and knowledge that can determine with reasonably certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup.

77.    In short, none of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third party's words or content. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for Defendants' good faith attempts to restrict access to objectionable content.

78.    Plaintiff is not alleging that Defendants are liable for what the third parties said, but for what Defendants did or did not do.

79.    None of Plaintiff's Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe social products and furnish adequate warnings of foreseeable dangers arising out

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 19

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 19 of 36   Document 1

of the use of their products without altering, deleting or modifying the content of a *single* third-party post or communication.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

80.    Christopher James ("CJ") Dawley was born on Feb. 13, 1997, in Burlington, Wisconsin.   CJ was a senior at Central High School in Paddock Lake. CJ worked as a busboy at Texas Roadhouse in Kenosha.   He was enrolled in Advanced Placement and Honors courses and was admitted to college in December 2014.

81.    CJ was a member of St. Alphonsus Catholic Church in New Munster. He was active at Central High School and loved golfing, volleyball, woods and metal class and was enrolled in Advanced Placement and Honors Classes. He formerly played baseball with the Lakeland Little League and played quarterback for the Bulldogs Football team. His greatest loves were his car, his tractor and fixing and taking things apart. He enjoyed boating, ATV riding, snowmobiling, tubing, camping and the outdoors.

82.    In approximately 2012, CJ acquired Facebook, Instagram and Snapchat social media products.  Because he was a minor at the time, CJ lacked contractual capacity to bind himself and his Estate to the terms of any User Agreements he may have clicked when signing up for Defendants' social media products.  Neither CJ nor his Estate is therefore subject to any arbitration, forum selection, choice of law or class action waiver set forth in said User Agreements

83.    After he acquired Defendants' social media products, CJ spent progressively more time communicating on social media through his smart phone and laptop computer.  By 2014, CJ had developed an addiction to Defendants' social media products, never left his smart phone, and everything he did was absorbed on his phone.  Through Facebook, Snapchat, and Instagram, he

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 20

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 20 of 36   Document 1

began exchanging explicit photographs with other users. CJ became obsessed with his body image and would communicate through social media at all hours of the night resulting in sleep deprivation. He would frequently be communicating on Instagram at 3am.

84. CJ never showed outward signs of depression or mental injury but became addicted to Defendants' social media products, progressively sleep deprived, and increasingly obsessed with his body image.

85. On January 4, 2015, while his family was cleaning Christmas decorations and dismantling their Christmas tree, CJ retreated into his room. He sent a text message to his best friend "God's speed" and posted the message "Who turned out the light?" on his Facebook page. CJ held a 22-caliber rifle in one hand, his smart phone in the other, and shot himself to death. Nobody heard the shot and his parents assumed that CJ was sleeping. Five hours later, CJ's sister discovered his body still clutching his smart phone.

86. CJ hand wrote the following message to his family on the envelope which contained his college acceptance letter:

> I don't want you to think this is at all your fault. It's not. I'm f****d up. You showed me love and family. I wish I didn't have to do this to you guys. I love you all more than the world. It's hard to be a person right now. And I wish I believed in God. If God does exist, he will have to beg for my forgiveness. There are a lot of things you don't know about me. What goes on inside my head scares me. I tried to be a good person. It's just as I am yelling in a dark tunnel running after the light so I can be happy. But my legs are tired and what's a man to do when the lights go out. Tell my friends thank you for the friendship and support and I love them with all my being. I tried.

87. CJ's death by suicide was the proximate result of the unreasonably dangerous Instagram, Snapchat, and Facebook products he used. As set forth in detail below, these products were not reasonably safe due to their defective design and inadequate warnings.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 21

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS    Filed 04/11/22    Page 21 of 36    Document 1

88. At the time of CJ's death and to this day, Defendants have actively concealed the fact and have "sought to stonewall and block this information [information about the dangerousness of their products, especially to young users] from becoming public." (Senator Blumenthal, October 5, 2022). Defendants "intentionally" hid vital information in their possession from the public, the US government, and governments, including information relating to the safety of children and the role of their algorithms in causing addiction and others harms.

89. Defendants made false statements to the press and public, designed to cover up the inherent dangers of their products and, even when asked direct questions as to how those products "impact the health and safety of our children, they choose to mislead and misdirect."

90. Plaintiff did not discover, or in the exercise of reasonable diligence could not have discovered, that CJ's death by suicide was caused by the Defendant's unreasonably dangerous products until September or October of 2021.

## V. PLAINTIFFS' CLAIMS

**COUNT I - STRICT PRODUCT LIABILITY (Design Defect)**

91. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 90 as if fully stated herein.

92. Defendant Meta's product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Meta and the omission of the alternative design renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property and existed at the time the product left the Meta's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of CJ Dawley's injury

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 22

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 22 of 36   Document 1

93.     Defendant Snap's product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Snap and the omission of the alternative design renders the product not reasonably safe.  This defective condition rendered the product unreasonably dangerous to persons or property and existed at the time the product left the Snap's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of CJ Dawley's injury.

94.     Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

95.     Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

A.      **Inadequate Safeguards From Harmful and Exploitative Content**

96.     As designed, Snapchat, Instagram and Facebook algorithms are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures.  It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and protects minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products.  The

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 23

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 23 of 36   Document 1

cost of designing Defendants' algorithms to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

97. Snap and Meta also engage in conduct, outside of the algorithms themselves, which is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user wellbeing.

98. Reasonable users (and their parents) would not expect that Defendants' would knowingly expose them to such harmful content and/or that Defendants' products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users, like CJ Dawley.

**B. Failure to Verify Minor Users' Age and Identity**

99. As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

100. Adults frequently set up user accounts on Defendants' social media products posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 24

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 24 of 36   Document 1

101.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

102.    Likewise, minor users who are under the age of 13 and/or whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty each user's actual age and, at least in some cases, Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They simply then choose to do nothing about that information as it relates to the specific, underaged users themselves.

103.    Moreover, reasonably accurate age and identity verification is not only feasible but widely deployed by on-line retailers and internet service providers.

104.    The cost of incorporating age and identify verification into Defendants' products would be negligible whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C.    Inadequate Parental Control and Monitoring**

105.    Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

106.    Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 25

**D.     Intentional Direction of Minor Users to Harmful and Exploitative Content**

107.    Default "recommendations" communicated to new teenage users, including Plaintiff, purposefully steered Plaintiff toward content Defendants knew to be harmful to children of his age and gender.

108.    Ad content pushed to new teenage users, including CJ Dawley, because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender.

**E.     Inadequate Protection of Minors from Sexual Exploitation and Abuse**

109.    Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images or report sex offenders to law enforcement or allow users' parents to readily report abusive users to law enforcement.

110.    Parents do not expect their children will use Defendants' products to exchange sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

111.    Minor users of Defendants' products lack the cognitive ability and life experience to identify on-line grooming behaviors by prurient adults and psychosocial maturity to decline invitations to exchange salacious material.

112.    Defendants' products are unreasonably dangerous and defective as designed because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation, and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 26

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 26 of 36   Document 1

## F.     Design of Addictive Social Media Products

113.     As designed, Defendants' social media products are addictive to minor users as follows:  When minors use design features such as "likes" it cause their brains release dopamine which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological base line to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

114.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, which is used by mental health professionals to diagnose mental disorders.  Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition.

115.     The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 27

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

a. Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

b. Tolerance, the need to spend more time using social media to satisfy the urge.

c. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e. Continuing to use social media despite problems.

f. Deceiving family members or others about the amount of time spent on social media.

g. The use of social media to relieve negative moods, such as guilt or hopelessness; and

h. Jeopardized school or work performance or relationships due to social media usage.

116. Defendants' advertising profits are directly tied to the amount of time that its users spend online, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

117. It is feasible to make Defendants' products less addictive to minor users by limiting the frequency and duration of access and suspending service during sleeping hours.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 28

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 28 of 36   Document 1

Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide and other forms self-harm among this vulnerable age cohort.

**G.     Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

118.    Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants know to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

119.    It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time.  It is feasible for Defendants to design products that identify a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

120.    Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.  Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants'

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 29

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 29 of 36   Document 1

data and algorithms to identify and restrict improper sexual solicitation, exploitation and abuse by adult users; and

121.     It is reasonable for parents to expect that platforms such as Instagram, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

122.     As a proximate result of these dangerous and defective design attributes of Defendants' products, Decedent CJ Dawley suffered severe mental harm leading to his suicide on January 4, 2015.   Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Defendants' products until 2021.

123.     As a result of these dangerous and defective design attributes of Defendants' products, Plaintiff DONNA DAWLEY, her husband and their surviving children have suffered loss of consortium, emotional distress, pain and suffering.

124.     Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram, Snapchat, and Facebook.

**COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)**

125.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 124 as if fully stated herein.

126.     Meta's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 30

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 30 of 36   Document 1

the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left defendant's control, reached the user or consumer without substantial change in the condition in which it was sold and was a cause of CJ Dawley's injury.

127. Snap's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left defendant's control, reached the user or consumer without substantial change in the condition in which it was sold and was a cause of CJ Dawley's injury.

128. Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of Snapchat, Instagram and Facebook.

129. Defendants' social media products rely on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers who do not expect that social media platforms are physically and/or psychologically addictive.

130. The magnitude of harm from addiction to Defendants' products is horrific ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

131. The harms resulting from minors' addictive use of social media platforms have been not only well- documented in the professional and scientific literature, but Meta had actual knowledge of such harms. On information and belief, Snap also has conducted internal studies

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 31

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 31 of 36   Document 1

documenting the addictive quality and harmful effects of its social media products on minor users.

132.    Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours.  Excessive screen time is harmful adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

133.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

134.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the products reasonably safe during ordinary and foreseeable use by children.

135.    As a result of Defendants' failure to warn, Decedent CJ Dawley suffered severe mental harm, leading to physical injury and death, from his use of Snapchat, Instagram and Facebook.

136.    As a result of Defendants' failure to warn, Plaintiff DONNA DAWLEY, her husband and their surviving children suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 32

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 32 of 36   Document 1

137.    Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram and Facebook.

**COUNT III – NEGLIGENCE**

138.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 137 as if fully stated herein.

139.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such as Decedent CJ Dawley.

140.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

141.    As product manufacturers marketing and selling products to residents of Wisconsin, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

142.    As business owners, Defendants owe their users who visit Defendants' social media platform and from whom Defendants derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to their business invitees.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 33

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS    Filed 04/11/22    Page 33 of 36    Document 1

143.     Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like CJ Dawley using their Snapchat Instagram and Facebook products.

144.     Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users.   Defendants' have extensive internal research indicating that their products are harmful, cause extensive mental harm and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

145.     Defendants were negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

146.     Defendants were negligent in failing to fully assess, investigate, and restrict the use of Snapchat, Instagram and Facebook by adults to sexually solicit, abuse, manipulate, and exploit minor users of their Instagram and Facebook products.

147.     Defendants were negligent in failing to provide users and parents the tools to ensure their social media products were used in a limited and safe manner by underage users.

148.     As a result of Defendants' negligence, Decedent CJ Dawley suffered severe mental harm, leading to death by suicide from his use of Snapchat, Instagram and Facebook.

149.     As a result of Defendants' negligence, Plaintiff DONNA DAWLEY, her husband and surviving children have suffered loss of consortium, emotional distress, pain and suffering.

150.     Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton conduct toward underage users, including CJ Dawley, whom they knew would be seriously harmed through the use of their social media products.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

**COUNT IV    DECEPTIVE TRADE PRACTICE WIS. STAT § 100.18**

151.    Paragraphs 1 through 150 are restated in their entirety.

152.    Meta actively represents to the public that its social media products are not addictive and safe for use by minors with the intent to induce use of their products by minors. This representation is untrue, deceptive, or misleading and caused the plaintiff a pecuniary loss.

153.    Snap actively represents to the public that its social media products are not addictive and safe for use by minors with the intent to induce use of their products by minors. This representation was untrue, deceptive, or misleading and caused the plaintiff a pecuniary loss.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant for monetary damages for the following harm:

1. Past physical and mental pain and suffering of CJ Dawley, in an amount to be more readily ascertained at the time and place set for trial.

2. Loss of consortium on behalf of CJ Dawley's statutory beneficiaries.

3. Plaintiffs' pecuniary loss and loss of Christopher Dawley's services, comfort, care, society and companionship.

4. Loss of future income and earning capacity of CJ Dawley.

5. Punitive damages.

6. For the reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 35

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 35 of 36   Document 1

7.  For such other and further relief as this Court deems just and equitable.


DATED this 11th day of April 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

_/s/ Matthew Bergman_
Matthew P. Bergman, WSBA No. 20894
matt@socialmediavictims.org
821 Second Avenue Suite 2100
Tel. 206-741-4862
Seattle, WA. 98104
Attorneys for Plaintiff

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 36

Social Media Victims
Law Center PLLC
801 second Avenue
Seattle WA 98104

Case 2:22-cv-00444-JPS   Filed 04/11/22   Page 36 of 36   Document 1